| | |
|---|---|
| International Association of Sheet Metal, Air, Rail, and Transportation Local Union No. 10, | Case No. 18-cv-01960 (ECT/LIB) |
| Plaintiff and Counterclaim Defendant, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| A-1 Refrigeration of Hibbing, Inc., d/b/a A-1 Refrigeration Heating and Air Conditioning, Inc., | |
| Defendant and Counterclaimant. | |

Justin D. Cummins, Cummins & Cummins, PLLP, Minneapolis, MN, for Plaintiff and Counterclaim Defendant International Association of Sheet Metal, Air, Rail, and Transportation Local Union No. 10.

Joseph J. Roby, Jr. and Susan L. Waldie, Johnson, Killen & Seiler, P.A., Duluth, MN, for Defendant and Counterclaimant A-1 Refrigeration of Hibbing, Inc., d/b/a A-1 Refrigeration Heating and Air Conditioning, Inc.

This matter is before the Court on the motion of Plaintiff and Counterclaim Defendant International Association of Sheet Metal, Air, Rail, and Transportation Local Union No. 10 ("Local 10") to dismiss the claims for breach of contract and defamation (Counts II and III, respectively, of the Counterclaim) filed by Defendant and Counterclaimant A-1 Refrigeration of Hibbing, Inc., d/b/a A-1 Refrigeration Heating and Air Conditioning, Inc. ("A-1"). *See* ECF No. 25. The Court has subject-matter jurisdiction over the breach-of-contract counterclaim pursuant to 28 U.S.C. § 1331 and 29 U.S.C.

§ 185(a) and (c) and supplemental jurisdiction over the defamation claim pursuant to 28 U.S.C. § 1367(a).

For the reasons described below, the Court grants Local 10's motion to dismiss with respect to the defamation claim and denies it with respect to the breach-of-contract claim.

I

A

On July 13, 2018, Local 10 filed a one-count Complaint seeking enforcement of a February 2018 arbitration award of more than $140,000 in unpaid fringe-benefit contributions it alleged A-1 owed under a 2017 collective-bargaining agreement ("CBA"). Compl. [ECF No. 1] ¶¶ 8, 12–13, 16–23. A-1 filed an Answer and Amended Counterclaim, denying that it was bound by the 2017 collective-bargaining agreement under which Local 10 pursued arbitration and sought fringe-benefit contributions, Am. Countercl.[1] [ECF No. 22] ¶¶ 6–13, and asserting claims for a declaratory judgment that the arbitration award is void *ab initio* for lack of any valid written arbitration agreement (Count I), for breach of an alleged verbal contract between Local 10 and A-1 (Count II), and for business defamation (Count III). Local 10 brings this motion for partial dismissal only as to Counts II and III, arguing that each is preempted under federal labor law. *See* Mot. [ECF No. 25]

---

[1] All paragraph citations in this memorandum opinion to any Amended Counterclaim or Second Amended Counterclaim refer to the paragraphs of the counterclaim section of that document, and not to the separately numbered answer section of the document.

After the Court heard argument on Local 10's motion, the parties stipulated to allowing A-1 to file an Answer and Second Amended Counterclaim to change an approximate date range in one paragraph of the counterclaim's factual allegations. ECF No. 39 ("Stipulation"). A-1 subsequently filed that amendment. ECF No. 40. The parties agreed that Local 10's motion for partial dismissal "and any related ruling on the Motion by the Court shall apply with identical scope and effect to the Second Amended Counterclaim Complaint as they do to the Amended Counterclaim Complaint." Stipulation at 1–2. U.S. Magistrate Judge Leo I. Brisbois subsequently entered an order adopting that stipulation. ECF No. 42. Because the parties and the Court agree that none of the changes in the Second Amended Counterclaim affects the disposition of Local 10's pending motion, the Court will address the parties' arguments as though they were made in reference to the Second Amended Counterclaim.

## B

A-1 acknowledges that on December 23, 2001, it signed a one-sentence document (the "2001 Document") agreeing to abide by the CBA with Local 10 that was then in effect (the "2001 CBA"). Second Am. Countercl. ¶ 5. The 2001 CBA required covered employers to make contributions to certain fringe-benefit funds and to adhere to certain grievance procedures, including binding arbitration. Aff. of Michael McCauley ("McCauley Aff."), Ex. 1 ("2001 CBA"), Arts. X, XVI-XXI [ECF No. 28-1 at 14, 21–26]. A-1 asserts that the 2001 Document "expired by its own terms on April 30, 2004, and it has not been renewed or reinstated." Second Am. Countercl. ¶ 6. Similarly, it asserts that the 2001 CBA, to which A-1 was undisputedly bound under the 2001 Document, was

"expressly scheduled to expire [on] April 30, 2004." *Id.* ¶ 5. Since April 30, 2004, A-1 has not considered itself bound by the 2001 CBA or by any other written arbitration agreement. *Id.* ¶ 9.

The 2001 Document, which A-1's president signed, states in full: "I hereby agree to abide by the labor agreement negotiated between Northern Minnesota Division of SMARCA of Minnesota, Inc., and Sheet Metal Workers' International Association, Local Union Number 10, effective May 1, 2001[,] with an expiration date of April 30, 2004."[2] McCauley Aff., Ex. 2 [ECF No. 28-1 at 34]. The 2001 CBA referenced in the 2001 Document[3] contains an evergreen clause that provides:

> This Agreement shall become effective on the 1st day of May, 2001, and remain in full force and effect through the 30th day of April, 2004, and shall continue in force from year to year thereafter, unless written notice of reopening is given not less than ninety (90) days prior to the expiration date. In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party.

---

[2] For legibility, this memorandum opinion converts quotations from the 2001 Document and the 2001 CBA that were originally printed in all capital letters into conventional typeface.

[3] The 2001 Document refers to a labor agreement between "Northern Minnesota Division of SMARCA of Minnesota, Inc., and Sheet Metal Workers' International Association, Local Union Number 10," McCauley Aff., Ex. 2, but the 2001 CBA Local 10 filed in support of its motion was negotiated between "Iron Range Division SMARCA, Inc. and Local Union No. 10 – Iron Range Unit," McCauley Aff., Ex. 1 at 2. The two documents cover the same initial effective time period of May 1, 2001 through April 30, 2004, and A-1 does not dispute that the document filed at Exhibit 1 to the McCauley Affidavit is the 2001 CBA under which it was originally bound.

McCauley Aff., Ex. 1 at 30–31. The 2001 CBA further provides that "[e]ach Employer hereby waives any right it may have to repudiate this Agreement during the term of the Agreement, or any modification or amendment to this Agreement."[4] *Id.* at 31. Nowhere in A-1's Answer and Second Amended Counterclaim does it allege that it has ever provided Local 10 with written notice of reopening, as contemplated by the 2001 CBA's evergreen clause; conducted or terminated any conferences relating to the reopening of the 2001 CBA; or undertaken any other affirmative act to terminate the 2001 CBA.

Notwithstanding the above-quoted contract language, A-1 alleges that at about the same time it signed the 2001 Document, it also reached a verbal agreement with Local 10. *See* Second Am. Countercl. ¶¶ 3, 4. Specifically, A-1 alleges the parties verbally agreed that one of A-1's co-owners, Mr. Aikey, would become a member of a different union, the Plumbers & Steamfitters Local 589; that A-1's other co-owner, Mr. Lees, would become a member of Local 10; and that dues and fringe-benefit contributions would be paid for each co-owner to his respective union. *Id.* ¶ 4. It appears that, according to A-1, from the time the initial term of the 2001 CBA "expired" in April 2004 and for six or seven years thereafter, the parties continued exclusively under the verbal agreement. *See id.* ¶¶ 6, 10, 15. Then, in "late 2010 or early 2011," at Local 10's request, the parties verbally agreed that dues for Local 10 also would be paid for Mr. Aikey, with the result that both owners of A-1 also became members of Local 10. *Id.* ¶¶ 10–12. A-1 alleges that the verbal

---

[4] For the reasons described in part II.B., below, these two documents are necessarily embraced by the Complaint, and therefore the Court may consider them in resolving Local 10's motion to dismiss without converting the motion into one for summary judgment.

agreements did not obligate it to make fringe-benefit contributions for Mr. Aikey or to arbitrate any disputes with Local 10. *Id.* ¶¶ 13, 14.

Local 10 did not object to the sufficiency of the payments A-1 made on Mr. Aikey's behalf until mid-2016, when Local 10's affiliated fund, the Sheet Metal Local No. 10 Control Board Trust Fund (the "Fund"), audited A-1 and preliminarily assessed fringe-benefit contributions allegedly owed on behalf of Mr. Aikey for 2012 through 2014. *Id.* ¶¶ 4, 15–16. A-1 objected to the assessment, citing the verbal agreements described above, and the Fund did not pursue the assessment for the years 2012 through 2014. *Id.* ¶ 16. In late 2017, the Fund again audited A-1 and preliminarily assessed fringe-benefit contributions allegedly owed on behalf of Mr. Aikey, this time for 2015 through 2017. *Id.* ¶ 17. It is this 2017 assessment that Local 10 ultimately pursued in the arbitration underlying its Complaint. *Id.*

Throughout the grievance process, including at the arbitration and subsequent appeal, A-1 argued that it was not bound by any written CBA during the relevant time period, was not obligated to arbitrate disputes with Local 10, and was participating in the arbitration process only under protest. *See generally id.* ¶¶ 18–31. The hearing panel found in favor of Local 10, and the appeal panel denied A-1's appeal. *Id.* ¶¶ 29, 31. Neither the arbitration panel nor the appeal panel explicitly addressed A-1's contention that it was under no obligation to arbitrate disputes with Local 10. *Id.* ¶¶ 29, 32.

A-1 further alleges that in late 2017 or early 2018—at roughly the same time the Fund was conducting its second preliminary audit and the parties were engaged in arbitration related to Local 10's conclusions in that audit—Local 10's agent made

statements "to the effect that [A-1] is not qualified or authorized to perform work on projects because Mr. Aikey is not a union member." *Id.* ¶ 54. The statement was made to at least six "persons or entities": three unidentified Max Gray Construction superintendents, one unidentified Hawk Construction superintendent, the Pipefitters local union, and the Electricians local union. *Id.* Max Gray and Hawk Construction were both important customers of A-1, *id.* ¶ 50, and Local 10's statements dissuaded both from doing business with A-1, *id.* ¶ 58. A-1 asserts that Local 10's statements were false and were made with actual malice—that is, that Local 10 either knew they were false or acted with reckless disregard of their truth or falsity—for three reasons: first, because Local 10 should have possessed records showing membership and dues payments for Mr. Aikey; second, because the statements were made by Local 10's business agent, who was familiar with the terms of the parties' verbal agreements; and third, because "nothing [A-1] could have said or did would have rendered it unqualified or unauthorized to perform sheet metal and other work." *Id.* ¶ 56. A-1 claims Local 10's contractual breaches and defamatory statements have cost, and will continue to cost, A-1 $40,000 to $60,000 per year in lost profits, and that it has suffered reputational damages of at least $100,000. *Id.*

Local 10 has moved to dismiss Counts II and III of the Counterclaim pursuant to Fed. R. Civ. P. 12(b)(1), arguing that federal labor law preempts those claims. Mot.; Mem. in Supp. at 4, 10–23 [ECF No. 27]. Local 10 further argues that, even if the defamation claim were not preempted, it nevertheless should be dismissed pursuant to Rule 12(b)(6) both because the statements at issue constitute non-actionable expressions of opinion and

because A-1 has not satisfied the heightened pleading standard governing statements made in relation to a labor dispute. Mem. in Supp. at 23–30.

## II

## A

A court reviewing a motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) must first determine whether the movant is making a "facial" attack or a "factual" attack. *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). Here, Local 10 makes a facial attack to subject-matter jurisdiction because it accepts as true all of A-1's factual allegations concerning jurisdiction. *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). In analyzing a facial attack, the Court "restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted).

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

B

Local 10 has filed a number of documents in support of its motion to dismiss: a copy of the 2001 Document, the 2001 CBA, business records reflecting A-1's payment of fringe-fund contributions and union dues for January 2006 through July 2018, *see* McCauley Aff., Exs. 1–4 [ECF Nos. 28-1–28-3], correspondence from A-1 to the Fund's counsel dated September 18, 2017, *see* McCauley Aff., Ex. 5 [ECF No. 28-3 at 8], and A-1's January 7, 2013 response to Local 10's December 26, 2012 request for tax information, *see* McCauley Aff., Ex. 6 [ECF No. 28-3 at 10].

Ordinarily, courts do not consider matters outside the pleadings in resolving a facial challenge to subject-matter jurisdiction or a Rule 12(b)(6) motion to dismiss, *see* Fed. R. Civ. P. 12(d), but the Court may consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings without transforming the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003) (citation omitted). Materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (citation and internal quotation marks omitted).

A-1 alleges the contents of the one-sentence agreement it signed with Local 10 in December 2001, *see* Second Am. Countercl. ¶¶ 5–6, and it concedes that Exhibit 2 to the McCauley Affidavit presents a true and correct copy of that agreement, *see* Mem. in Opp'n at 4 [ECF No. 36] (stating that the exhibits attached to the McCauley Affidavit "exist and appear to be authentic"). The copy of the 2001 Document attached at Exhibit 2 of the

McCauley Affidavit is therefore necessarily embraced by the Counterclaim, and the Court may properly consider it in connection with Local 10's motion to dismiss.

Likewise, A-1 alleges certain contents of the 2001 CBA, *see* Second Am. Countercl. ¶ 5, and it concedes that Exhibit 1 to the McCauley Affidavit presents a true and correct copy of that document, *see* Mem. in Opp'n at 4. The copy of the CBA attached at Exhibit 1 of the McCauley Affidavit therefore is similarly embraced by the Counterclaim, and the Court also may properly consider the CBA in connection with Local 10's motion to dismiss.

A-1 seems to argue that, even if the Court considers the 2001 Document and the CBA in resolving Local 10's motion, the Court must accept A-1's characterization of the legal consequence of those documents. *See* Mem. in Opp'n at 4 (stating that the exhibits "do not establish a binding written agreement to arbitrate and do not establish the validity of the purported arbitration award" because "what is alleged in the answer and amended counterclaim [ ] must prevail over contrary allegations in the complaint, an exhibit to the complaint, an affidavit, or an exhibit to an affidavit"). But that is not correct. A contract's interpretation, including whether a contract expired under its own terms, is a legal conclusion. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (citation and internal quotation marks omitted). "In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss." *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (citation omitted). "This is true even if contract documents not attached to the complaint refute a breach-of-contract claim." *Zean v. Fairview Health Servs.*, 858 F.3d

520, 526–27 (8th Cir. 2017) (collecting cases).  Accordingly, the Court may consider the 2001 Document and 2001 CBA and may make its own assessment of whether, as A-1 asserts, those documents automatically expired on April 30, 2004.

The business records and correspondence at Exhibits 3 through 6 of the McCauley Affidavit are not embraced by the Counterclaim, as Local 10 argues they are.  *See, e.g.*, Mem. in Supp. at 6–7, 17.  Those documents are not directly referenced in or attached to the Counterclaim, and they are not part of the public record.  *See Ashford v. Douglas Cty.*, 880 F.3d 990, 992 (8th Cir. 2018).  Furthermore, to the extent that Local 10 has submitted them to contradict the factual allegations (as opposed to the legal conclusions) contained in the Counterclaim regarding, *inter alia*, A-1's own conduct or its understanding of its contribution obligations with respect to Local 10, the Court may not properly consider them on a motion to dismiss.  *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  The Court therefore will not consider Exhibits 3 through 6 in resolving Local 10's motion.

C

Local 10 contends that § 301 of the Labor Management Relations Act ("LMRA") preempts A-1's breach of contract claim (Count II).  *See generally* 29 U.S.C. § 185 (commonly referred to as "Section 301").  Section 301 of the LMRA provides that "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U.S.C. § 185(a).  Section 301 is "more than jurisdictional," it "authorizes the federal courts to

11

fashion a body of federal law for the enforcement of these collective bargaining agreements." *Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 450–51 (1957). "The Supreme Court has made clear that the LMRA completely preempts [ ] 'claims founded directly on rights created by collective-bargaining agreements' and 'claims substantially dependent on analysis of a collective-bargaining agreement.'" *Boldt v. N. States Power Co.*, 904 F.3d 586, 590 (8th Cir. 2018) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (internal quotation marks omitted)). A claim is substantially dependent on analysis of a CBA if it "require[s] the interpretation of some specific provision" of that agreement, *Meyer v. Schnucks Mkts., Inc.*, 163 F.3d 1048, 1051 (8th Cir. 1998), or any document that agreement incorporates by reference, *see Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 204 (1985).

"[T]he preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization. Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 23 (1983) (footnote omitted) (internal quotation marks omitted). A CBA need not be reduced to writing for § 301 to apply; "[a]ll that is required is conduct manifesting an intention to abide and be bound by certain terms." *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 500 n.2 (7th Cir. 1996); *see also Local Union No. 115, United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Inds. v. Townsend & Bottum, Inc.*, 383 F. Supp. 1339, 1343 (W.D. Pa. 1974), *aff'd,* 521 F.2d 1399 (3d Cir. 1975) ("The Act covers any agreement, written or

unwritten, formal or informal, which purports to resolve employment controversies between contractors and unions.").

To the extent A-1 might seek to pursue a state-law claim for breach of contract, such a claim would be preempted under § 301. On its face, A-1's Count II is premised on Local 10's alleged breach of its verbal agreement with A-1. Second Am. Countercl. ¶¶ 47–48. Because its claim is "founded directly" on the contents of that alleged verbal agreement, and because A-1's success on that claim requires the interpretation of the specific terms of any such agreement, any breach-of-contract claim it may be attempting to bring under state law is completely preempted.[5] *See Caterpillar*, 482 U.S. at 394. Accordingly, that claim "must either be treated as a § 301 claim or dismissed as pre-empted." *Allis-Chalmers*, 471 U.S. at 220 (internal citation omitted); *see also Boldt v. N. States Power Co.*, 904 F.3d 586, 593 (8th Cir. 2018) (quoting *Allis-Chalmers*, 471 U.S. at 220). At the hearing on this motion, A-1 confirmed that it intends to pursue its breach-of-contract claim under § 301 and not under state law. *See also* Second Am. Countercl. ¶ 2 (alleging that the Court "has subject matter jurisdiction over the claims made in this second amended counterclaim pursuant to section 301(a) of the [LMRA]").

Local 10 attempts to analogize this case to several others in which non-contract state-law claims were dismissed as preempted under § 301 because the resolution of those state-law tort claims turned on the interpretation of a CBA. *See* Mem. in Supp. at 10–12 (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362 (1990) (fraud and negligence

---

[5]     Whether a court would have supplemental jurisdiction over a state-law contract claim absent § 301's complete preclusive effect is immaterial. *See* Mem. in Opp'n at 5–7.

13

claims preempted); *Karnewie-Tuah v. Frazier*, 757 N.W.2d 714 (Minn. Ct. App. 2008) (defamation, tortious interference, and disparagement claims); *Boldt*, 904 F.3d 586 (8th Cir. 2018) (disability discrimination under the Minnesota Human Rights Act); *Trustees of Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc.*, 450 F.3d 324 (8th Cir. 2006) (fraudulent misrepresentation)). But those cases are distinguishable. Although it is true that § 301 preempts state-law claims where those claims are substantially dependent on an analysis of an agreement between an employer and a union, A-1's Count II does not purport to state anything but a breach-of-contract claim. It would be illogical for the Court to hold, as Local 10 suggests, that a breach-of-contract claim, even if brought under § 301, is preempted because its resolution substantially depends on the interpretation of a contract. That the claim depends on the interpretation of a contract is, by definition, the hallmark of *every* breach-of-contract claim, including those brought under § 301.

Local 10 next argues that § 301 precludes A-1's Count II under a line of cases that bars claims seeking to invalidate a labor agreement. *See* Mem. in Supp. at 13–14. In *Textron Lycoming Reciprocating Engine Division, Avco Corp. v. UAW*, 523 U.S. 653 (1998), the Supreme Court explained that because § 301(a), "[b]y its terms . . . confers federal subject-matter jurisdiction only over '[s]uits for violation of contracts,'" *id.* at 656 (quoting 29 U.S.C. § 185(a)), that provision does not provide a mechanism by which a party may sue to invalidate, rather than to enforce, a contract, *id.* at 657. Although it may sometimes be appropriate for a court to adjudicate the validity of a CBA, § 301:

simply erects a gateway through which parties may pass into federal court; once they have entered, it does not restrict the legal landscape they may traverse. Thus if, in the course of deciding whether a plaintiff is entitled to relief for the defendant's alleged violation of a contract, the defendant interposes the affirmative defense that the contract was invalid, the court may, consistent with § 301(a), adjudicate that defense. Similarly, a declaratory judgment plaintiff accused of violating a collective-bargaining agreement may ask a court to declare the agreement invalid. But in these cases, the federal court's power to adjudicate the contract's validity is ancillary to, and not independent of, its power to adjudicate "[s]uits for violation of contracts."

*Id.* at 658 (internal citation omitted). The Eighth Circuit has explained that "*Textron* only permits a litigant to raise the validity of a contract as an affirmative defense; it does not allow such claims to be asserted offensively." *Gerhardson v. Gopher News Co.*, 698 F.3d 1052, 1058 (8th Cir. 2012) (citation omitted). Accordingly, while "the invalidity of a contract may be raised defensively in a contract enforcement action, . . . federal courts are not authorized to provide other relief based on the same invalidity." *Id.*

If the Court were to conclude that A-1 had plausibly pleaded a breach-of-contract claim based on a verbal agreement between the parties, then such a claim would survive Local 10's motion to dismiss because it would present exactly the type of suit for violation of a contract that § 301 contemplates. But Local 10 argues that, whatever A-1 might have called the claim, it is not truly one for breach of contract; rather, Local 10 argues, A-1's Count II presents a stealth affirmative defense against Local 10's complaint. *See* Mem. in Supp. at 13–14. According to Local 10, A-1's breach-of-contract claim is implicitly premised on a legal conclusion that A-1 is no longer bound by any written CBA with Local 10. *See id.* at 12 ("In truth, A-1's purported breach of contract claim is essentially a

request for the Court to interpret the CBA because the alleged verbal side deals underlying the 'breach of contract' claim only exist in relation to the CBA."). Therefore, Local 10 argues, A-1's Count II is properly understood not as a freestanding § 301 claim, but as a claim premised on invalidating its alleged written contract with Local 10, which is a type of claim barred under *Textron* and *Gerhardson*. *See id.* at 14.

The Court concludes that, at the Rule 12 stage, the breach-of-contract claim A-1 pleads in Count II passes through the "gateway" erected by § 301. *Textron*, 523 U.S. at 658. A-1 has pleaded the elements of a quintessential § 301 claim: (1) the violation (2) of a contract (3) between an employer and a union. *See* Mem. in Opp'n at 9–10; 29 U.S.C. § 185(a). Specifically, A-1 alleges that Local 10 violated its verbal agreement with A-1 that Mr. Aikey would be a member of the union without any obligation by A-1 to make fringe-benefit contributions or to arbitrate disputes. *See* Mem. in Opp'n at 9–10. Indeed, each party has alleged its own § 301 claim, each of which arises under a different alleged labor agreement. Based on the arguments presented to the Court, it seems likely that one of the chief disputes that will need to be resolved in the course of this litigation is which agreement bound the parties during the time for which Local 10 seeks payment of fringe-benefit contributions. That is not a dispute the Court can properly resolve at this time, given the record before it and the applicable standard of review.

In reaching this conclusion, the Court has not simply accepted as true the assertions in A-1's counterclaim that the CBA expired by its own terms in April 2004. *See* Second Am. Countercl. ¶¶ 5–9. Those assertions are "legal conclusion[s] couched as a factual allegation," and they are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678.

The Court notes, for example, that A-1 has not alleged that it ever provided Local 10 with notice of reopening, as contemplated in the CBA's evergreen clause, or otherwise taken affirmative steps to terminate the CBA.

Nevertheless, accepting A-1's *factual* (as opposed to *legal*) allegations as true, and drawing all reasonable inferences in its favor, the Court concludes that A-1 has plausibly pleaded that it reached the separate, superseding verbal agreement with Local 10 that it now seeks to enforce through its § 301 claim. Specifically, A-1 has alleged a course of dealing in which, from the time it agreed to pay Local 10 membership dues for Mr. Aikey in late 2010 or early 2011 through the present, it never made fringe-benefit contributions for him. Second Am. Countercl. ¶¶ 10, 13, 15. Yet the Fund first attempted to assess unpaid fringe-benefit contributions in mid-2016 for the years 2012 through 2014, and did not pursue that assessment when A-1 reminded it of the terms of the parties' verbal agreements. *Id.* ¶ 16. According to A-1, the Fund did not decide until late 2017 to pursue fringe-benefit contributions for Mr. Aikey, and then only as to the years 2015 through 2017. *Id.* ¶ 17. In other words, under A-1's version of the facts, the parties conducted themselves for more than five years in a manner that conforms with the verbal agreement alleged by A-1 before Local 10 pursued relief based on some other alleged agreement.

Furthermore, although it is somewhat troubling that there is no indication in A-1's counterclaim that it ever took steps to terminate the 2001 CBA as provided in the evergreen clause, neither will the Court infer that the 2001 CBA continues to bind the parties. Even Local 10 does not argue that it does: in its own Complaint, it alleges that a *different* collective-bargaining agreement from 2017 governs the parties. *See* Compl. ¶ 8. A period

of approximately thirteen years elapsed between the earliest possible conclusion of the original term of the 2001 CBA under which A-1 admits it was bound and the start date of the alleged agreement under which Local 10 pursued the arbitration underlying this case. A lot can happen in thirteen years. For the Court to assume that every contract renegotiation in that thirteen-year period resulted in the inclusion of the same evergreen clause, arbitration agreement, contribution obligations, and non-modification agreement, and that A-1 continued to be bound under each such iteration, would not afford A-1 the reasonable inferences to which it is entitled on this motion.[6]

D

In enacting the National Labor Relations Act ("NLRA"):

> Congress expressly recognized that collective organization of segments of the labor force into bargaining units capable of exercising economic power comparable to that possessed by employers may produce benefits for the entire economy in the form of higher wages, job security, and improved working conditions. Congress decided that in the long run those benefits would outweigh the occasional costs of industrial strife associated with the organization of unions and the negotiation and enforcement of collective-bargaining agreements.

*Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*, 436 U.S. 180, 190 (1978).

---

[6] Local 10 suggests that A-1's allegations establishing the existence of an oral agreement are implausible because, according to Local 10, making dues payments and fringe-fund contributions without having a written agreement—which A-1 alleges it did—confesses a felony. *See* Mem. in Supp. at 16. Presumably, A-1 disagrees. Regardless, illegality is an affirmative defense, Fed. R. Civ. P. 8(c)(1), and there is no basis at this stage to determine conclusively that A-1's allegations confess a crime or render A-1's claim implausible.

To achieve those goals, the NLRA:

> protected the collective-bargaining activities of employees and their representatives and created a regulatory scheme to be administered by an independent agency which would develop experience and expertise in the labor relations area. The [Supreme] Court promptly decided that the federal agency's power to implement the policies of the new legislation was exclusive . . . . The interest in uniform development of the new national labor policy required that matters which fell squarely within the regulatory jurisdiction of the [National Labor Relations] Board [("NLRB")] be evaluated in the first instance by that agency.

*Id.* at 191. Consequently, the grant of exclusive jurisdiction to the NLRB often preempts federal courts from hearing claims stemming from labor disputes. This type of preemption is commonly called *Garmon* preemption, after the Supreme Court case that established its basic analytical framework, *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959).

*Garmon* preemption often bars claims relating to speech made in the context of a labor dispute. "Federal labor law encourages free debate on issues dividing labor and management and has long been characterized by a tolerance for robust union speech." *BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners*, 90 F.3d 1318, 1328 (8th Cir. 1996) (citation omitted). Accordingly, state-law defamation claims based on statements made during a labor dispute are generally preempted under *Garmon* unless the claimant can show by clear and convincing evidence that the statements were made with malice and caused actual damages. *Linn v. United Plant Guard Workers Local 114*, 383 U.S. 53, 61, 65 (1966); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Local 655*, 39 F.3d 191, 195 (8th Cir. 1994). "Where the union acts for some arguably job-related

reason and not out of pure social or political concerns, a labor dispute exists," such that *Garmon* will preempt defamation claims unless the allegedly defamatory statements satisfy *Linn*'s malicious libel test.[7] *Beverly Hills Foodland*, 39 F.3d at 195 (citation and internal quotation marks omitted). A statement satisfies the malice requirement if it was made "with knowledge that it was false or with reckless disregard of whether it was false." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 281 (1974) (citation omitted). A mere failure to investigate does not suffice to show recklessness. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

False statements are actionable as reckless only if the speaker possessed "a high degree of awareness of probable falsity." *Id.* (citation and internal quotation marks and alteration omitted). Furthermore, "[t]he presence of a false statement of fact is a *sine qua non* for the maintenance of state defamation action in the labor field." *Beverly Hills Foodland*, 39 F.3d at 195 (citing *Austin*, 418 U.S. at 283–85). In other words, statements of opinion, terms "requiring a subjective determination and [which are] therefore incapable of factual proof," and "loose language or undefined slogans that are part of the conventional give and take in our economic and political controversies—like 'unfair' or 'fascist'"—do not suffice. *Id.* at 196 (citation omitted).

---

[7] The test applied in the labor context under *Linn* is functionally identical to the standard announced in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), with respect to defamation claims by public figures, *see Austin*, 418 U.S. at 281 (explaining that *Linn* "explicitly adopted the standards of *New York Times*"). Consequently, defamation cases in the labor context commonly rely on case law developed in the context of press freedom.

A-1 alleges only a general approximation of the statements at issue in its defamation claim: it alleges that Local 10 stated something "to the effect that [A-1] is not qualified or authorized to perform work on projects because Mr. Aikey is not a union member." Second Am. Countercl. ¶ 54. To the extent Local 10's statement addressed whether A-1 was "qualified" to work on projects, that statement constitutes non-actionable opinion. Accordingly, the only potentially factual statement A-1 alleges is the statement that A-1 is not authorized to work on projects because Mr. Aikey was not a union member. But A-1 has not sufficiently alleged that Local 10 possessed the requisite malice in making that statement.

In the context alleged by A-1, such a statement merely encapsulates Local 10's position with respect to the dispute that had arisen between the parties as to whether A-1 was in compliance with whatever labor agreement existed between them at the time.[8] That dispute was primarily legal: Was A-1 bound by a written CBA that required it to make fringe-benefit contributions for Mr. Aikey and to arbitrate disputes with Local 10? Neither A-1 nor Local 10 has cited authority addressing the question of whether a party's statement of its position on a question of legal interpretation constitutes a statement of fact, or of opinion, or of something in between, such as a prediction that can be shown to be true or

---

[8] Local 10 has not argued that, because determining whether the statements it is alleged to have made turns on an interpretation of the parties' obligations under the operative labor agreement, the claim is barred under § 301. Because Local 10 has not raised the argument, the Court does not consider it in granting Local 10's motion as to the defamation claim but notes that § 301 preemption may provide an alternative basis for dismissing Count III.

false only at some future point in time. As discussed above, if they were opinion statements, they were not actionable.

But even if a statement of a party's legal interpretation constitutes a statement of fact, A-1 has not plausibly pleaded sufficient facts to show that, at the time Local 10 made the statements, it knew or possessed a high degree of awareness that its legal interpretation was false. Indeed, Local 10 filed a grievance pursuant to the written labor agreement it considered operative, and it arbitrated that dispute. Second Am. Countercl. ¶¶ 21, 26. A-1 argued to the arbitration panel and again to the appeal panel that it was not bound under the written agreement under which Local 10 pursued arbitration, but the hearing panel implicitly found that the written labor agreement in fact did bind A-1, ruling in favor of Local 10—a ruling that was not disturbed on appeal. *Id*. ¶¶ 27–32. In other words, Local 10's allegedly defamatory statements simply encapsulated a legal interpretation of the parties' relationship with which the arbitral tribunal later agreed. Particularly given the subsequent ratification of Local 10's legal interpretation by an arbitrator—who had the benefit of a fuller evidentiary record than that currently available to the Court, *see id*. ¶ 28, the Court concludes that A-1 has not plausibly pleaded that Local 10 knew or possessed a high degree of awareness that its legal interpretation was incorrect. Accordingly, A-1's defamation claim is subject to *Garmon* preemption.[9]

_____

[9]     A-1 cites no authority for its argument that a state-law claim over which a federal court might, in another context, have supplemental jurisdiction under 28 U.S.C. § 1367(a) may be maintained in federal court even if is subject to the NLRB's exclusive jurisdiction by virtue of *Garmon* preemption.

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Plaintiff and Counterclaim Defendant's motion for partial dismissal of the Second Amended Counterclaim Complaint [ECF No. 25] is **GRANTED IN PART AND DENIED IN PART** as follows:

1.      As to Count II, alleging breach of contract, the motion is **DENIED**, and

2.      As to Count III, alleging defamation, the motion is **GRANTED**.


Dated:  December 14, 2018                    s/ Eric C. Tostrud
                                             Eric C. Tostrud
                                             United States District Court